**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| OAKLEY, INC., | Case No. 23-cv-04966 |
| Plaintiff, | |
| | **Judge Lindsay C. Jenkins** |
| v. | |
| | **Magistrate Judge Jeffrey T. Gilbert** |
| LIGHT IN THE BOX LIMITED and LIGHTINTHEBOX HOLDING CO., LTD., | |
| Defendants. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT**
**<u>LIGHT IN THE BOX LIMITED</u>**

Plaintiff Oakley, Inc. ("Oakley" or "Plaintiff") submits the following memorandum in support of its Motion for Partial Summary Judgment (the "Motion") against Defendant Light In The Box Limited ("Defendant").

## I.     BACKGROUND

### A.     Oakley and the Oakley Trademarks

Oakley is an internationally recognized manufacturer, distributor and retailer of sports eyewear, apparel, and accessories, including tactical gloves ("Oakley Products"). Plaintiff's L.R. 56.1 Statement of Material Facts [PSF 6]. Oakley Products are distributed and sold to consumers through retailers throughout the United States, the official oakley.com website which was launched in 1995, and Oakley O Stores. [PSF 28]. ██████████████████████████ ████████████████████████. [PSF 30].

Oakley incorporates a variety of distinctive marks in the design of its various Oakley Products. [PSF 11]. Oakley owns U.S. federal trademark registrations for its trademarks, including Registration No. 5,109,790 for the  mark (the "Ellipse Mark"), Registration No. 3,331,124 for the  mark, Registration Nos. 1,522,692 and 2,293,046 for the OAKLEY word mark, and Registration No. 1,740,532 for the UNOBTAINIUM word mark (collectively, the "OAKLEY Trademarks). [PSF 12]. The registrations for the OAKLEY Trademarks are valid, subsisting, and in full force and effect. [PSF 13]. Oakley has used the Ellipse Mark continuously in U.S. commerce since at least 1993. [PSF 14]. Registration No. 5,109,790 for the Ellipse Mark is incontestable pursuant to 15 U.S.C. § 1065. [PSF 15].

Oakley's innovative marketing and product designs have enabled Oakley to "become a ubiquitous staple in everyday fashion" achieving "explosive success," widespread recognition, and fame. [PSF 17]. Oakley has expended substantial resources in developing and marketing its brand,

1

including ███████████████████████████████. [PSF 16]. For example, in 2015, Oakley launched the ONE OBSESSION campaign, which invites and inspires consumers to join Oakley's global network of renowned athlete ambassadors in living out their passions. [PSF 19]. This multi-channel brand campaign spans twenty-two countries and includes digital, social, advertising, outdoor, retail activations, live events, and a digital experience on oakley.com/oneobsession. *Id.* Over its long and storied history, Oakley has used many athletic endorsers, including two-time Masters Champion Bubba Watson, three-time Super Bowl MVP Patrick Mahomes II, Olympian Shaun White, and NBA Hall-Of-Famer Michael Jordan. [PSF 20]. In 2023, Oakley also announced it is extending its current partnership with the NFL until 2030, and Oakley will remain the official on-field eye wear sponsor of the NFL. [PSF 21]. Oakley has also sponsored NASCAR driver Kyle Larson, Formula 1 driver Fernando Alonso, and was the official eyewear supplier to the Olympic Team USA. [PSF 22]. As part of its agreement with Team USA, hundreds of athletes from more than fifteen sports wore Oakley sunglasses at the 2012 London Olympic Games. [PSF 23]. Oakley also supplied product for the 2014, 2016, and 2018 Olympic Games. *Id.* In 2023, Oakley announced that it will be the official eyewear of Team USA for the 2028 Los Angeles Olympics. *Id.*

Products bearing the OAKLEY Trademarks are widely recognized and exclusively associated by consumers, the public, and the trade as being high-quality products sourced from Oakley. [PSF 25]. Moreover, numerous media outlets have recognized Oakley's Ellipse Mark as "distinctive" or "iconic," even noting that "everyone wants Oakley's logo for themselves." *See* [PSF 26]. Likewise, Oakley has been the subject of extensive unsolicited publicity resulting from its high-quality, innovative designs. [PSF 18].

Oakley has a worldwide anti-counterfeiting program and regularly investigates factories, brick-and-mortar stores, flea markets, websites and online marketplace listings. [PSF 32]. Oakley has continuously and actively enforced its rights in the OAKLEY Trademarks (including its Ellipse Mark) by filing trademark infringement and counterfeiting lawsuits, including at least sixty-five lawsuits where at least one counterfeit product at issue was a pair of gloves. [PSF 32-33]. Oakley has enforced against tens of thousands of infringing websites and marketplace listings. [PSF 34].

**B.** **Defendant's History of Selling Counterfeit Oakley Products**

Defendant operates a fully interactive e-commerce website at lightinthebox.com. [PSF 7]. Defendant advertises, markets, offers for sale, and sells products to consumers in the United States through its website. *Id.* Defendant controls all operational aspects of lightinthebox.com ("Defendant's Website"), including selecting products to sell, pricing, shipment and delivery. *Id.*

Oakley was first notified in June of 2014 that Defendant was selling counterfeit Oakley products through Defendant's Website, and subsequently sent a cease-and-desist letter. [PSF 35]. Defendant responded to Oakley's cease-and-desist letter promising that "LITB also reviewed the products for sale on its websites that appeared to bear a symbol similar to your client's identified "O" trademarks, and LITB immediately discontinued further sale of these products as well." [PSF 36]. On July 1, 2014, Oakley filed *Oakley, Inc. v. LightInTheBox Holding Co., Ltd., et al.*, No. 14-cv-04995 (N.D. Ill. July 1, 2019) ("Lawsuit I"). [PSF 37]. Oakley and Defendant entered into a procedural and recovery agreement on October 24, 2014, where Defendant explicitly agreed in writing to stop selling counterfeit Oakley products. [PSF 38]. At Defendant's request, during Lawsuit I, Oakley also provided recommendations on how Defendant could avoid infringement in the future, including only using vetted suppliers and product inspection. *See* [PSF 54]. Despite the agreement, Defendant continued to offer for sale and sell counterfeit Oakley products. [PSF

39]. On March 26, 2015, Oakley and Defendant entered into a settlement agreement (the "Agreement I") resolving Lawsuit I. [PSF 40].

In April 2016, Oakley discovered that Defendant was selling counterfeit products in violation of Agreement I. [PSF 41]. On May 18, 2016, Oakley filed *Luxottica Group S.p.A., et al. v. LightInTheBox Holding Co., Ltd., et al*., No. 16-cv-05314 (N.D. Ill. May 18, 2016) ("Lawsuit II"). [PSF 42]. On October 19, 2016, a preliminary injunction was entered enjoining Defendant from further unauthorized use of Oakley's trademarks, wherein the court noted that there are "serious questions about Defendant's ability to police its own website to ensure that it is not selling counterfeit goods." [PSF 43]. On March 2, 2018, Oakley and Defendant entered into a settlement agreement resolving Lawsuit II ("Agreement II"). [PSF 44]. As part of Agreement II, Defendant agreed to the entry of a Stipulated Final Order for a $1,000,000 Consent Judgment and Permanent Injunction from using Oakley's trademarks. *Id.*

In April 2019, Oakley discovered that Defendant was selling gloves bearing a counterfeit Ellipse Mark. [PSF 45]. On May 30, 2019, Oakley filed *Oakley, Inc. v. Light In The Box Limited*, No. 19-cv-03602 (N.D. Ill. May 30, 2019) ("Lawsuit III"). [PSF 46]. On October 9, 2019, the parties entered into a settlement agreement resolving Lawsuit III, where Defendant agreed to permanently cease further infringement of the OAKLEY Trademarks. [PSF 47].

In sum, Oakley's registrations for the Ellipse mark (covering either sunglasses or gloves) have been at issue in Lawsuits I, II, and III. [PSF 48]. Defendant has been subject to a preliminary injunction and permanent injunction in Lawsuit II and has agreed in writing on at least five occasions to stop selling counterfeit Oakley products. [PSF 36, 38, 40, 43-44, 47]. Defendant also receives "perhaps a few hundred [intellectual property claims] a year," and has been sued at least ten times for intellectual property infringement by other rights owners. *See* [PSF 49].

4

### C.     Defendant's Continued Sale of Counterfeit Oakley Products

Despite the above, Defendant advertised, offered for sale, and sold the product shown in

Figure 1 below on Defendant's Website (the "Counterfeit Product").  [PSF 50].



*Figure 1*

While the images in the listing did not show the Ellipse Mark, Oakley purchased the Counterfeit

Product to investigate because of its history with Defendant and because it was the same type of

product at issue in Lawsuit III.  [PSF 51].  Images of the Counterfeit Product (as received) are

shown in Figure 2, confirming use of the Ellipse Mark on the product.  *See* [PSF 52].



*Figure 2*

5

After examining the received product, Oakley concluded that the Counterfeit Product was not a genuine Oakley Product. [PSF 52]. Oakley has not licensed or authorized Defendant to use any of the OAKLEY Trademarks, including the Ellipse Mark, and Defendant is not an authorized retailer of genuine Oakley Products. [PSF 53].

## II. OAKLEY IS ENTITLED TO SUMMARY JUDGMENT AGAINST DEFENDANT AS TO LIABILITY

### A. Summary Judgment Standard

A district "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears the initial burden of demonstrating that these requirements have been met; it may discharge this responsibility by showing 'that there is an absence of evidence to support the non-moving party's case.'" *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). Once the moving party has met this burden, the non-moving party must "come forward with specific facts demonstrating that there is a genuine issue for trial." *Id.*

### B. Oakley Is Entitled to Summary Judgment On Counts I And II

A defendant is liable for trademark infringement and counterfeiting under the Lanham Act when it, "without the consent of the registrant[,] use[s] in commerce, any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods ... on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(a). To prevail on a trademark infringement claim, a plaintiff must show that (1) its mark is protectable and (2) the defendant's use of the mark is likely to cause confusion. *CAE, Inc. v. Clean Air Eng'g Inc*., 267 F.3d 660, 673-74 (7th Cir. 2001). The test for trademark infringement under 15 U.S.C. § 1114(1)

and 15 U.S.C. § 1125(a) are the same. *See id.* Since Oakley has established it is entitled to summary judgment on Count I it is entitled to summary judgment on Count II.

**C.      Oakley's Ellipse Mark is Federally Registered and Incontestable**

The Ellipse Mark is registered with the United States Patent and Trademark Office on the Principal Register. *See* [PSF 12-13]. The Ellipse Mark is incontestable pursuant to 15 U.S.C. § 1065. [PSF 15]. Incontestable status under 15 U.S.C. § 1065 provides that the registrations for the Ellipse Mark is conclusive evidence of the validity of Oakley's registered mark and of the registration of the mark, of Oakley's ownership of the trademark, and of Oakley's exclusive right to use the mark in commerce. 15 U.S.C. §§ 1115(b), 1057(b), 1065.

**D.      Defendant Offered to Sell and Sold Unauthorized Products Bearing Counterfeit Versions of the Ellipse Mark**

Defendant's sale of products bearing a counterfeit of the Ellipse Mark via the Defendant's Website was without Oakley's authorization and Defendant is not an authorized retailer of genuine Oakley Products, and the Counterfeit Product is not a genuine Oakley Product. *See* [PSF 50-53].

**E.      Defendant's Use of the Ellipse Mark Causes a Likelihood of Confusion and Infringes as a Matter of Law**

Trademark infringement amounts to counterfeiting when an infringer's violation consists of: (1) using a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark," (2) in connection with the same goods referenced in the registration certificate. *See* 15 U.S.C. §§ 1116(d)(1)(B), 1117(b)-(c), 1127; *see also* Joint Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076, H12078 ("Spurious" means "not genuine or authentic"). Defendant used an ellipse mark that identical with, or substantially indistinguishable from Oakley's Ellipse Mark in connection with selling gloves. *See* Figure 3. Gloves are the same

type of good covered by the Ellipse Mark registration.  *See* [PSF 12-13].  As such, Defendant's product is counterfeit. 15 U.S.C. § 1127 (definition of "counterfeit").



*Figure 3*

In a trademark infringement case, "if the evidence is so one-sided that there can be no doubt about how the question should be answered," whether likelihood of confusion exists may be resolved on summary judgment.  *CAE, Inc.*, 267 F.3d at 677.  The Seventh Circuit has held that where, as here, "one produces counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product, there is a presumption of a likelihood of confusion."  *Microsoft Corp. v. Rechanik*, 249 F. App'x 476, 479 (7th Cir. 2007); *see also NBA Props., Inc., et al. v. Yan Zhou, et al*., 2017 U.S. Dist. LEXIS 148971, at *5 (N.D. Ill. Sept. 14, 2017).  Accordingly, the Court can presume a likelihood of confusion from Defendant's use of the counterfeit Ellipse Mark.

8

The result is the same when considered in light of the Seventh Circuit's seven enumerated factors to determine whether there is a likelihood of confusion, which include: (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree and care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any actual confusion; and, (7) the intent of the defendant to "palm off" its products as that of another. *AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008). Generally, a case "where a defendant uses an identical mark on competitive goods" is "open and shut." *See Cigarette Racing Team, Inc. v. Donzi Marie Corp*., 1985 WL 71995, at *7 (N.D. Ill. Sept. 16, 1985) (quotation omitted). Moreover, the "Lanham Act's protections also extend to post-sale confusion of potential customers." *CAE Inc.,* 267 F.3d at 683. Post-sale confusion is particularly concerning when the infringement concerns products like clothing. *See Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 222 (1st Cir.1989).

First, Defendant's Counterfeit Product bears a mark identical with or substantially indistinguishable from the Ellipse Mark. *See* Figure 3. Oakley and Defendant sell products, including tactical gloves, through the Internet using similar online advertising methods. *See* [PSF 8-10, 24, 28-29]. Oakley and Defendant use the Ellipse Mark on the same position on the same type of product (gloves). Figure 3; *see* [PSF 31, 53]. Thus, consumers looking for genuine Oakley Products (who are diverse with varying degrees of sophistication) are likely to have difficulty distinguishing genuine Oakley Products from Counterfeit Products. *See* [PSF 8, 27]. *See Ty, Inc. v. Jones Grp., Inc*., 237 F.3d 891, 899 (7th Cir. 2001); *see also Trans Union LLC v. Credit Rsch., Inc.*, 142 F. Supp. 2d 1029, 1038 (N.D. Ill. 2001) ("When a buyer class is mixed, the standard of care to be exercised by the reasonably prudent purchaser will be equal to that of the least sophisticated consumer in the class."). This is particularly true in this case where the Defendant's

Counterfeit Product was sold on the Internet (*see* [PSF 50-52]) and consumers could not inspect the physical products. Further, Defendant was selling its product for $14.49. [PSF 50]. Courts assume "that the more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases." *CAE Inc.*, 267 F.3d at 683.

The OAKLEY Trademarks are famous marks, as Defendant's ████████████████ ███████. *See* [PSF 60]. Oakley has expended substantial time, money, and other resources in developing, and advertising the OAKLEY Trademarks, ████████████████████████ ████████████████████ [PSF 16, 19-24]. Moreover, Oakley generated ████████████ ██████████████████████████████. [PSF 30]. Oakley and its Oakley Products bearing the Ellipse Marks have also been the subject of extensive unsolicited publicity. [PSF 17-18, 26]. The Ellipse Mark is also a "common thread among" Oakley Products, showing "the mark is distinctive" and that Oakley "markets its products relying on the public's recognition of this term." *Ty, Inc.*, 237 F.3d at 899; [PSF 31]. This evidence is more than sufficient to show that the Ellipse Mark is a very strong mark. *See AutoZone*, 543 F.3d at 933.

Oakley does not need to prove actual consumer confusion; rather Oakley only needs to show a likelihood of confusion exists, particularly given the compelling evidence that Defendant is attempting to "palm off" its goods as genuine Oakley Products. *CAE, Inc.*, 267 F.3d at 685. Moreover, the Seventh Circuit recognizes that the Lanham Act's protections extend to post-sale confusion of potential customers. *Id.* at 683. Post-sale confusion refers to a situation in which, for example, a potential customer sees a product bearing the infringing label used by others, and mistakenly attributes the product to the brand owner, thereby influencing his or her buying decision, either positively or negatively. *Id.* Here, gloves are a type of product that most people

will see in the post-sale context (worn by purchasers). Therefore, there is high likelihood of post-sale confusion because potential customers would see Defendant's Counterfeit Product on someone else's hands, and mistakenly attribute that product to Oakley.

This Court may infer Defendant's intent to confuse consumers "from the similarity of the marks where the senior mark has attained great notoriety." *AutoZone*, 543 F.3d at 934. Here, in addition to the similarity of the Counterfeit Products to genuine Oakley Products, Defendant's intent is shown by its use of confusing similar versions of other OAKLEY Trademarks. Figure 4.



| OAKLEY Trademarks | Counterfeit Product Packaging |
|---|---|

*Figure 4*

In sum, the undisputed material facts are "so one-sided that there can be no doubt" that virtually all factors favor Oakley. *CAE, Inc.*, 267 F.3d at 677. Therefore, Defendant is liable for trademark infringement and counterfeiting as a matter of law.

## III.    OAKLEY IS ENTITLED TO SUMMARY JUDGMENT ON THE ISSUE OF DEFENDANT'S WILLFULNESS

Oakley respectfully requests that this Court enter summary judgment on the issue of willfulness. "Infringement is willful when the infringer knows that it is infringing or acts 'in reckless disregard'" of that possibility." *H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1045 (E.D. Wis. 2018) (citing *Wildlife Exp. Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 511,

514 (7th Cir. 1994) (determination of willfulness based on record as a whole)).  Knowledge or reckless disregard need not be proven directly, but can be inferred.  *Id.*

This is the **fourth** time Oakley has sued Defendant for trademark counterfeiting.  *See* [PSF 4, 37, 42, 46].  *See Microsoft Corp. v. Ram Distribution, LLC*, 625 F. Supp. 2d 674, 683 (E.D. Wis. 2008) (repeat lawsuit against defendant by plaintiff for similar infringement demonstrates reckless disregard); *see also Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849 (2d Cir. 1995) (same).  Defendant receives "perhaps a few hundred [intellectual property claims] a year," and has been sued many times for intellectual property infringement by other rights owners. *See* [PSF 49]. Since at least as early as 2014, Defendant has known of Oakley, Oakley's products, and the Oakley's trademarks.  *See* [PSF 36].  Defendant has also made assurances multiple times, in writing, that it would immediately cease further infringement of Oakley's trademarks and is still subject to the permanent injunction entered in Lawsuit II.  *See* [PSF 36, 38, 40, 43-44, 47].

Defendant's repeated history of counterfeiting Oakley products demonstrates that Defendant has failed to put adequate anti-infringement procedures in place, including specific procedures suggested by Oakley at Defendant's request.  *Ram Distribution*, 625 F. Supp. 2d at 683 (failure to not infringe "despite repeated warnings and an injunction, gives rise to an inference of willful conduct by defendants").  Specifically, Defendant still fails to adequately vet suppliers of its products, employ an adequate number of staff to detect infringement and inspect products, verify that actual products match the products shown in proposed listings, or inspect physical products.  *See, infra*.  These failures are not accidents.  They were conscious business decisions that Defendant made because adequate precautions, Defendant felt, would be too expensive and inefficient. Defendant's intentional decisions show that it is "willing to risk possible infringement and subsequent payment for infringement as a 'cost of doing business.'"  *Wildlife Exp.*, 18 F.3d at

514. Defendant needs to be held accountable for its refusal to remedy known infringement risks. *SunFrog*, 311 F. Supp. 3d at 1040 ("Trademark law is not concerned with attempt to avoid infringement; it is execution that matters."). Nearly a decade later there are still "serious questions about [Defendant's] ability to police its own website to ensure that it is not selling counterfeit goods." *See* [PSF 43].

## A. Inadequate Due Diligence into Suppliers

Oakley previously recommended to Defendant that it should "only work with trusted suppliers." *See* [PSF 54]. In this case, Defendant did not perform adequate due diligence as to the supplier Shenzhen Baifa Technology Co. Ltd. ("Shenzhen Baifa") of the Counterfeit Products. *See* [PSF 55]. Defendant verified the business registration information provided to Defendant by Shenzhen Baifa. *Id.* Beyond this, virtually no due diligence was performed, including asking whether Shenzhen Baifa had been previously accused of trademark infringement or whether it has its own anti-infringement procedures in place. *Id.* As Defendant knows, it cannot blindly rely on any warranties in its supplier agreement. *See* [PSF 56]. Defendant also did not verify where Shenzhen Baifa sourced the Counterfeit Products. [PSF 55]. *See Bambu Sales*, 58 F.3d at 854 (failure to conduct due diligence into source of goods supported reckless disregard); *John Wiley*, 327 F. Supp. 3d at 627 (ordering from known supplier of counterfeit goods supports reckless disregard). Given Defendant's history, it was "well aware of the dangers posed by continued purchasing" from unvetted sources. *Ram Distribution*, 625 F. Supp. 2d at 683.

## B. Failure To Conduct Adequate Product Inspection

Oakley previously warned Defendant that it "should confirm that the sample products are the actual products that the supplier intends to sell [and] that the products provided in photographs are the actual products being sold." *See* [PSF 54]. But, Defendant did not request samples of

products from its suppliers to verify that the physical products match the listing images as a matter of course. *See* [PSF 57]. Defendant felt this would be too expensive and inefficient. *Id.* Instead, Defendant's standard operating procedure is limited to primarily conducting a quality inspection for the first product a customer orders or performing periodic quality inspections if a product classifies as a "hot sale," meaning a popular item as determined by Defendant's internal metrics. *See* [PSF 58]. Moreover, the quality inspection procedure does not include checking for possible infringement. *Id.* As a result, Defendant's data shows only 12.47% of products sold in 2022 and 14.75% of products sold in 2023 were inspected. *Id.* Defendant stores, processes, and packs all products to ship to consumers from its warehouses. *See* [PSF 59]. Yet, Defendant does inspect the physical products shipping from its warehouse or confirm that the listing images match the physical product. *See Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1314-15 (11th Cir. 2019) (failure to inspect products supports inference of willfulness).

Defendant's own intellectual property training materials ██████████████████ ████████████████████████████████████████████ ████████████ ████████████████████████████████████ [PSF 60]. The Counterfeit Product is also the same product involved in Lawsuit III. [PSF 46]. During Lawsuit III, Defendant "found another glove that is similar to the one Oakley sells, but there is no sign of the 'O' in the glove picture posted by the seller[.] Records show this seller only sold one pair of gloves ... but they refused to provide all the pictures of the gloves for us to determine whether these gloves have the 'O' image. Our client has removed any similar gloves pictures with or without the 'O' image." [PSF 61]. As such, Defendant knew that gloves like the Counterfeit Product typically bear the Ellipse Mark, and that suppliers use pictures of similar gloves without the Ellipse Mark.

Despite this, Defendant did not request product images or samples of the Counterfeit Product before listing it for sale on Defendant's Website, or subject it to extra inspections. [PSF 62].

Finally, if Defendant's representations with respect to Lawsuit III are accurate, images of product listings of gloves without the "O" image were delisted for potential infringement. Images of product listings that are delisted for potential infringement are uploaded to Defendant's keyword and image recognition program that scans and compares product images of new products to the delisted product images. *See* [PSF 63]. This should have flagged the images of the Counterfeit Products in this case, so either the Counterfeit Products were flagged and no further investigation was performed, or this process does not work. *See Fendi*, 689 F. Supp. 2d 585 (failure to follow anti-infringement procedure shows reckless disregard); *see also SunFrog*, 311 F. Supp. 3d at 1046 (inadequate anti-infringement procedure shows reckless disregard). Moreover, Oakley previously told Defendant that its various departments "should be adequately staffed to perform the necessary reviews." *See* [PSF 54]. However, Defendant only employs about fifty employees (without special training) to conduct product inspections, and employs only about twenty employees who are responsible for directly approving hundreds of thousands of products in thousands of categories, from hundreds of suppliers. *See* [PSF 64]. Considering the parties' history and the known risk with the gloves, Defendant knowingly disregarded that risk of infringement. As such, this case is just another example of Defendant's "pattern of conduct so unreasonable as to constitute reckless disregard." *Beastie Boys v. Monster Energy Co.*, 66 F. Supp. 3d 424, 439 (S.D.N.Y. 2014).

## **<u>CONCLUSION</u>**

For the foregoing reasons, Oakley respectfully requests that this Court enter summary judgment against Defendant for federal trademark infringement and counterfeiting (Count I) and false designation of origin (Count II) of the Ellipse Mark, and that Defendant's conduct was willful.

Dated this 18th day of March 2025.       Respectfully submitted,

/s/ Justin R. Gaudio
Amy C. Ziegler
Justin R. Gaudio
Allyson M. Martin
Berel Y. Lakovitsky
Greer, Burns & Crain, Ltd.
200 West Madison Street, Suite 2100
Chicago, Illinois 60606
312.360.0080
312.360.9315 (facsimile)
aziegler@gbc.law
jgaudio@gbc.law
amartin@gbc.law
blakovitsky@gbc.law

*Counsel for Plaintiff Oakley, Inc.*

16

## CERTIFICATE OF SERVICE

I hereby certify that on this 18th day of March 2025, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system. The CM/ECF system will send a "Notice of Electronic Filing" to all attorneys of record in this case.

/s/ Justin R. Gaudio
Amy C. Ziegler
Justin R. Gaudio
Allyson M. Martin
Berel Y. Lakovitsky
Greer, Burns & Crain, Ltd.
200 West Madison Street, Suite 2100
Chicago, Illinois 60606
312.360.0080
312.360.9315 (facsimile)
aziegler@gbc.law
jgaudio@gbc.law
amartin@gbc.law
blakovitsky@gbc.law

*Counsel for Plaintiff Oakley, Inc.*

17