**U**NITED **S**TATES **D**ISTRICT **C**OURT
**FOR THE** **N**ORTHERN **D**ISTRICT **OF** **I**LLINOIS
**E**ASTERN **D**IVISION

| | |
|---|---|
| Oakley, Inc., *Plaintiff*, v. Light in the Box, Ltd. *et al.*, *Defendants*. | No. 23 CV 4966 Judge Lindsay C. Jenkins |

**M**EMORANDUM **O**PINION **AND** **O**RDER

Oakley, Inc. filed this action against Light in the Box Limited and Light in the Box Holding Co., Ltd. ("Defendants") alleging Defendants sell products featuring counterfeit and infringing trademarks on their website, lightinthebox.com. [Dkt. 1.][1] Oakley's complaint brings claims for federal trademark infringement and counterfeiting under 15 U.S.C. § 1114 (Count I), false designation of origin under 15 U.S.C. § 1125(a) (Count II) and breach of contract (Count III). [Dkt. 1.] Oakley now moves for summary judgment on Counts One and Two. Because Defendants have presented no evidence that would allow a reasonable jury to find in their favor, the court grants the motion.

**I.   Background**

Oakley is manufacturer, distributor and retailer of sports eyewear and apparel, including tactical gloves. [Dkt. 65, ¶¶ 2, 9.][2] Relevant here, it is undisputed that Oakley owns several federal trademark registrations including the "Oakley" word mark and a mark known as the "Ellipse Mark." [Dkt. 60, ¶¶ 12, 15.] All of Oakley's registrations are valid and in full force and effect, and Oakley has used the Ellipse mark continuously in U.S. commerce since at least 1993. [*Id.*, ¶¶ 13-14.]

---

[1]   Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

[2]   "On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). Local Rule 56.1 requires the moving party to file a statement of material facts with citations to specific supporting evidence in the record. L.R. 56.1(a)(2); *see also* L.R. 56.1(d). The opposing party must then respond to each fact by either admitting it or disputing it with its own supporting evidence. L.R. 56.1(b)(2); *see also* L.R. 56.1(e). The non-moving party may also file additional facts supporting its position. L.R. 56.1(b)(3). Defendants fail to properly dispute some of Oakley's cited facts so those facts are deemed admitted. [*See e.g*, Dkt. 60, ¶¶ 6, 25, 29, 31.] ("Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material.") L.R. 56.1(e)(3); *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012) (where that party has failed to create a genuine dispute, the fact is deemed admitted).

Defendants sell a variety of consumer goods and products at lightinthebox.com. It is undisputed that lightinthebox.com "offers for sale hundreds of thousands of items at any given time" and that Defendants' vendor-suppliers number in the hundreds. [Dkt. 69, ¶ 1-4; Dkt. 60, ¶ 7.] Gloves are among the products Defendants offer for sale on their website. [*Id.*, ¶ 50.]

Oakley and Defendants are familiar foes: This is the fourth such lawsuit Oakley has filed against Defendants in recent years. *See Oakley, Inc. v. LightInTheBox Holding Co., Ltd*, 14-cv-04995; *Luxottica Group S.p.A., et al. v. LightInTheBox Holding Co., Ltd., et al.*, 16-cv-05314; *Oakley, Inc. v. Light In The Box Limited*, 19-cv-03602 [Dkt. 1, ¶¶ 2-8, ¶¶ 37-48.] The first two lawsuits involved sunglasses (a product Defendants no longer sell) and the third lawsuit involved gloves. [*Id.*; Dkt. 69, ¶¶ 31-33.]

Prior to filing this lawsuit, Oakley ordered a pair of Defendants' gloves from lightinthebox.com. [*Id.*, ¶¶ 51-52.] The product listing Oakley used to make the purchase, depicted in Figure 3, shows a hand wearing a glove described as "Tactical Gloves Sport Gloves Half Finger" "Shooting Hunting Gloves" for $14.49. [Dkt. 60, ¶ 50.] According to Defendants, the gloves Oakley purchased were supplied from Shenzhen Baifa Technology Co. Ltd. [Dkt. 69, ¶ 16.] Defendants assert that it sold a total of five pairs of the gloves in the United States, though this is disputed. [*Id.*, ¶ 18.] They also say that upon learning of allegations of infringement, they deactivated and removed the page listing, though this too is disputed. [*Id.*, ¶ 23.]

Oakley contends that the pair of gloves it purchased, depicted in Figure 4, are not a genuine Oakley product even though the gloves use the Ellipse mark. [Dkt. 20, ¶ 52.] Defendants dispute the characterization of their gloves as counterfeit, but there is no dispute that Oakley has not licensed or authorized Defendants to use any of its trademarks, and that Defendants are not an authorized retailer. [*Id.*, ¶¶ 51-53.]

## II.  Legal Standard

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dept' of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A party opposing summary judgment must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

### III. Analysis

#### A. Trademark Infringement

Under the Lanham Act, a party may assert claims for trademark infringement, *see* 15 U.S.C. § 1114(1). To prevail on such a claim, a plaintiff must establish that (1) its mark is protected and (2) the defendant's use of the mark is likely to cause confusion among consumers. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 461 (7th Cir. 2000). Similarly, to prevail under its false designation of origin claim under § 1125(a), a plaintiff must show that: (1) the defendant used a false designation of origin or false representation in connection with its goods; (2) the defendant caused those goods to enter interstate commerce; and (3) consumers are likely to be confused by the false representation. *Web Printing Controls Co., Inc. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1204 (7th Cir. 1990). Counterfeiting is a particular type of trademark infringement under § 1114(1)(a), where the defendant uses "a spurious mark [that] is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127 (defining "counterfeit"); *N. Am. Van Lines, Inc. v. N. Am. Moving & Storage, Inc.*, 2020 WL 703178, at *3–4 (N.D. Ind. Feb. 10, 2020) ("Trademark infringement, including counterfeiting, is prohibited under 15 U.S.C. § 1114 .... However, not all trademark infringement is counterfeiting.")

Here, there is no dispute that the Ellipse mark (among others) is a valid and incontestable mark, or that Oakley has the exclusive right to use the trademark in commerce. [Dkt. 60, ¶¶ 13-15, 53.] What the parties dispute is whether Defendants' use of the Ellipse trademark is likely to cause confusion among consumers.

##### 1. Likelihood of Confusion: Presumption Test

Relying on the Seventh Circuit's non-precedential opinion in *Microsoft Corp. v. Rechanik*, Oakley urges the court to presume likelihood of confusion based on Defendants' producing counterfeit goods in an attempt to capitalize on the popularity of another's product. 249 Fed. App'x 476, 479 (7th Cir. 2007). According to Oakley, Defendants' product is at least substantially indistinguishable from the Ellipse mark, making Defendants' image counterfeit under § 1127. Defendants disagree, focusing their response on the ways in which the mark depicted on the gloves is different from the Ellipse mark. [Dkt. 59 at 14 (describing the oval on the gloves as "nearly uniform in width around all sides and lacks the recognizable thick lines on the left and right sides" which is distinguishable from the "relatively thin top and bottom sides" of the Ellipse).] Oakley characterizes these distinctions as mere "perceived trivial differences" that do not establish a genuine dispute that Defendants' mark is counterfeit. [Dkt. 52-1 at 8; Dkt. 68 at 3-4.]

The court declines to presume a likelihood of confusion of the Ellipse mark and instead turns to the Seventh Circuit's seven-factor test to determine whether consumers are likely to be confused. *See AutoZone, Inc. v. Strick*, 543 F.3d 923, 929 (7th Cir. 2008).

## 2. Likelihood of Confusion: Seven Factor Test

The Seventh Circuit uses a seven-factor test to assess likelihood of consumer confusion:

> (1) similarity between the marks; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of the defendant to "palm off" his product as that of another.

*Republic Techs., NA. LLC v. BBK Tobacco & Foods, LLP*, 135 F.4th 572, 584 (7th Cir. 2025). No single factor is dispositive, but usually, "the similarity of the marks, the defendant's intent, and actual confusion" are most important. *Packman v. Chicago Trib. Co.,* 267 F.3d 628, 643 (7th Cir. 2001). Whether likelihood of confusion exists is generally a question of fact, but may be resolved on summary judgment "if the evidence is so one-sided that there can be no doubt about how the question should be answered." *CAE, Inc. v. Clean Air Eng., Inc.*, 267 F.3d 660, 677 (7th Cir. 2001). The court's task at summary judgment is to ask "whether a reasonable factfinder could decide that there was a likelihood of confusion in light of all the record evidence," "weighing the seven factors—not the evidence." *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 424 (7th Cir. 2019) (cleaned up).

As to the first factor, the similarity of the marks, "marks are troublingly similar if a consumer viewing one party's mark would likely associate the product with the other party's product." *Uncommon*, 926 F.3d at 425 (citing *AutoZone, Inc.*, 543 F.3d at 929; *Nike, Inc. v. "Just Did It" Enters.*, 6 F.3d 1225, 1228–29 (7th Cir. 1993)). The court must "examine the entirety of the labels, not just the mark in isolation." *Id.* (citing *Sorensen v. WD-40 Co.,* 792 F.3d 712, 726 (7th Cir. 2015)).

Here, the mark displayed on Defendants' glove in Figure 4 is nearly indistinguishable from Oakley's trademark. Both products generally use the same oval shaped symbol located in the same area of the glove. *AutoZone*, 543 F.3d at 930 (similar font and use indicates similarity of marks). [Dkt. 52-1 at 9 (Fig. 4, comparing the purchased glove from Defendant with known Oakley gloves.)] Both parties sell their products, including tactical gloves, online using similar online advertising methods. [Dkt. 60, ¶¶ 8-10, 24, 28-29]. Defendants rightly point out that there are some slight differences: Defendants' oval is nearly uniform in thickness whereas Oakley's mark appears with "thick lines on the left and right sides and the relatively thin top and bottom sides." [Dkt. 59 at 14.] Though this distinction arguably makes consumer confusion a touch less likely, see *Packman*, 267 F.3d at 643, the overall similarity of the marks favors Oakley, even when viewed in Defendants' favor. [Dkt. 60, ¶ 50 (Fig. 3.)]

The next factor, product similarity, also weighs in favor of confusion. As just discussed, both products are gloves and the mark is depicted in the same area of the

4

item. The third factor, area and manner of concurrent use, and the fourth factor, degree of consumer care, also establish likelihood of confusion. All agree that both parties sell their products over the Internet using the same advertising methods. Defendants argue there can be no pre-sale or point-of sale confusion because the glove listing on lightinthebox.com does not visibly display or otherwise expressly depict the Ellipse mark in the text of the advertisement, in the product images, "or anywhere on the listing webpage," making the listing nothing more than a "generic, unbranded glove product." [Dkt. 59 at 7-8.][3] They also argue that Oakley cannot show post-sale confusion because it has not pointed to evidence that individuals who encounter Defendants' gloves post-sale inspect them closely enough to observe their inferior quality in a way that would affect a later decision to purchase an Oakley product. [*Id.* at 24.]

On the former point, the court takes Defendants' point about a lack of pre-sale or point-of sale confusion. But as Oakley points out, that Defendants did not present the gloves as an authentic Oakley product ignores what happens when the gloves leave Defendants' warehouse. *Coach, Inc. v. Treasure Box, Inc.*, 2013 WL 2402922 (N.D. Ind. May 31, 2013) (noting that the Lanham Act's protections extend to post-sale confusion) (citing *CAE, Inc.*, 267 F.3d at 683.) On the latter point, there is nothing to suggest that a consumer purchasing tactical gloves would carefully investigate whether the product is genuinely made by Oakley. But the court is aware of no requirement that Oakley must present evidence showing that consumers encountering Defendants' gloves closely inspect them to observe differences such that it would affect a later purchasing decision. At least in the Seventh Circuit, post-sale confusion refers to a circumstance where "a *potential* customer sees a product bearing the infringing label used by others and mistakenly attributes the product to the brand owner, thereby influencing his buying decision, either positively or negatively." *Id.* (emphasis added). In short, considering that Defendants' mark so closely resembles the Ellipse mark, there is still a likelihood of confusion that consumers will think that Oakley is indeed the maker of the product.

Also relevant to consumer care, "if a product is widely accessible and inexpensive it follows that consumers will exercise little care in discriminating among product makers." *Uncommon, LLC*, 926 F.3d at 426 (citing *Sorensen*, 792 F.3d at 730.) Here, the gloves are readily available and relatively inexpensive. Oakley purchased a pair for $14.49, whereas Oakley's gloves are priced at roughly $50 a pair. [Dkt. 60, ¶ 50; Dkt. 59 at 11.] Defendants argue that the low price means that a potential customer would know that Defendants' gloves were not actually associated with Oakley, and that the product card shipped with the gloves "contains Chinese characters, obvious English misspellings, grammatical errors, half sentences with missing text, and repeat sentences" alerting any reasonable customer that the gloves were not associated with Oakley. [*Id.*]

---

[3]  Defendants' prior use of an obscured Ellipse mark on a glove was the subject of their conduct in the third lawsuit. [Dkt. 60, ¶ 61.]

5

The court does not agree. If anything, low cost, mass availability "means that consumers will not exercise much care in differentiating products," thus favoring Oakley. *Uncommon, LLC*, 926 F.3d at 426. Potential customers who view Defendants' gloves "in a post-sale environment—that is, out in the world—would almost certainly mistakenly think the products are genuine." *H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1035 (E.D. Wis. 2018).

The fifth factor, the strength of Oakley's mark, weighs strongly in Oakley's favor. The "strength" of a mark in this context refers to the "distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular ... source." *Eli Lilly*, 233 F.3d at 464. It often corresponds to a mark's economic and marketing strength. *AutoZone*, 543 F.3d at 933 (observing that the strength of the plaintiff's mark was evidenced by its display in thousands of retail outlets nationwide, supported by millions in marketing expenditures, and in use for decades). Here, Defendants do not seriously dispute that the Oakley brand generally, and the Ellipse Mark specifically, is commercially strong, *see* dkt. 59 at 18, nor could they considering the undisputed facts. [See *e.g.*, Dkt. 60, ¶¶ 16 (Oakley's expended resources on developing and marketing its brand); ¶ 30 (Oakley's revenue).] Instead, Defendants argue that the mark is not "conceptually strong" and that "post-sale confusion cannot be inferred from the strength of the Ellipse mark alone without any evidence corroborating Plaintiff's post-sale confusion theory." [Dkt. 59 at 18-20.]

The court does not agree that this meaningfully undermines the strength of Oakley's mark. Defendants cite cases where courts in other districts and circuits have observed that basic marks like letters and geometrical shapes can be viewed as weak marks.[4] But aside from *arguing* that the Ellipse Mark is not conceptually strong because the "extent of stylization" in Oakley's "O" is "marginal", they cite to no evidence or testimony supporting lack of conceptual strength. Even assuming that the Ellipse mark is not "inherently nor actually distinctive" thus suggestive of weakness, there is no denying that "robust 'economic and marketing' power," is "a sign of mark strength." *Uncommon, LLC*, 926 F.3d at 426; *Volkswagen AG v. iman365-usa*, 2020 WL 977969, at *6 (N.D. Ill. Feb. 28, 2020.) Here, Defendants do not dispute that Oakley expends substantial resources in developing and marketing its brand. [Dkt. 60, ¶ 16.] This factor weighs heavily in Oakley's favor and no reasonable jury could say otherwise.

The sixth factor, actual confusion, is neutral because Oakley does not point to evidence of actual confusion. [Dkt. 68 at 9 (arguing instead that the Court can "infer there would be actual confusion" and an intent to confuse consumers based on "he similarity of the marks.)] Still, as Oakley correctly notes, such evidence is not a hard-and-fast requirement. *CAE, Inc.*, 267 F.3d at 683 (though "evidence of actual

---

[4] Even the in-district case to which they cite, *Bump Health, Inc. v. Miss to Mrs. Wedding Gifts, Inc.* 2023 WL 7220172, at *4 (N.D. Ill. Nov. 2, 2023) does not strictly support Defendants' argument. ("Courts analyze the strength of a party's mark by evaluating *either* its commercial strength, its conceptual strength, or both.) (emphasis added).

confusion, if available, is entitled to substantial weight" "this evidence is not required to prove that a likelihood of confusion exists.")

Finally, the seventh factor asks whether Defendants intended to palm off the gloves as Oakley's. In the infringement context, "intent refers to the intent to confuse customers, not merely the intent to use a mark that is already in use somewhere else." *Roadget v. PDD Holdings, Inc.*, 2023 WL 4865005, at \*5 (July 31, 2023). As already discussed, the striking similarity of the mark evinces an intent by Defendants to pass off its products as genuine, licensed Oakley goods, allowing a factfinder to reasonably infer that Defendants' appropriation was intentional. This is especially true here given Defendants' prior use of the Ellipse mark was the subject of three prior lawsuits. The nearly identical marks on similar gloves permits an inference of intent to confuse. *Autozone*, 543 F.3d at 934.

To sum up, two of the three most important factors—the similarity of the marks and the defendant's intent—all favor Oakley, as do the similarity of the products, the area and manner of concurrent use, the degree of consumer care and strength of the mark. *Packman*, 267 F.3d at 643. Overall, "there can be no doubt" that Defendants' use of the Ellipse mark is likely to cause consumer confusion. Likelihood of confusion may often be a jury question, but because nearly all the factors weigh heavily in Oakley's favor, or are neutral, this case is one where summary judgment is appropriate. *CAE, Inc.*, 267 F.3d at 687. A reasonable jury has no choice but to conclude that consumers are likely to be confused about the origin of the Defendants' product. *See AutoZone*, 543 F.3d at 929.

Since Oakley has established it is entitled to summary judgment on its trademark infringement and counterfeiting claim (Count I), it is also entitled to summary judgment on its false designation of origin claim (Count II), something Defendants do not dispute. *CAE*, 267 F.3d at 673–74.

### B. Willfulness

Oakley argues that Defendants engaged in willful infringement. A defendant engages in willful infringement if he knew that his conduct constituted infringement or if he acted in reckless disregard of the owner's rights. *See Wildlife Exp. Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 511–12 (7th Cir. 1994); *see also Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 590 (7th Cir. 1989) ("Willful blindness is knowledge enough.") Knowledge may be inferred from the infringer's conduct. *See Wildlife*, 18 F.3d at 511. A finding of willfulness matters to an ultimate award of damages.

Defendants' willfully infringed Oakley's Ellipse Mark. As Oakley argues, this lawsuit is the *fourth* time Oakley has sued Defendants for trademark infringement of the Ellipse mark. Past lawsuits filed against a defendant can serve as evidence of willfulness. *Burberry Ltd. v. Salim*, 2013 WL 12146120, at \*4 (C.D. Cal. July 12, 2013) ("Defendant appears to have exhibited a repeated pattern of trademark counterfeiting.... This past conduct is relevant to the instant suit.... [T]he Court

7

concludes that Defendant's conduct was willful."). Likewise, prior infringement is relevant to assessing an infringer's intent. *JUUL Labs, Inc. v. Chou*, 676 F. Supp. 3d 827, 849 (C.D. Cal. 2023).

Here, there can be no doubt that the repeated history of counterfeiting Oakley products—first sunglasses and more recently gloves—demonstrates willfulness. This is so despite the "verification processes" and quality control measures Defendants profess to use to prevent selling counterfeit merchandise. [Dkt. 69, ¶¶ 4-15.] Indeed, no one doubts that Defendants have some anti-infringement measures in place. But the problem is their failure to implement *effective* anti-infringement tools and procedures. As Oakley notes, it suggested specific procedures (at Defendants' request) in prior lawsuits, to no avail. Defendants were well aware of the dangers posed by continuing their conduct, but elected to continue infringing anyway, including over the ten-year period since the first lawsuit was filed.

Defendants do not seriously contest this conclusion; they half-heartedly argue that a willfulness finding is unwarranted because the first two lawsuits involved sunglasses, not gloves. This is nonsense. All four cases involved the Ellipse mark and the third lawsuit involved infringing gloves. Defendants have repeatedly made hollow assurances that they would immediately cease further infringement and, even now, are still subject to the permanent injunction entered in the second lawsuit. [Dkt. 60, ¶¶ 36, 38, 40, 43-44, 47.] They remain undeterred.

None of Defendants' remaining arguments are persuasive. Any "substantial steps" Defendants describe to prevent unlawful sales are, at best, empty in the face of overwhelming evidence to the contrary. There is virtually no evidence that Defendants *adequately* vetted suppliers, terminated problematic suppliers, or implemented meaningful and effective quality inspections or effective anti-infringement training. In short, the decision to continue, despite repeated warnings, multiple lawsuits with financial settlements, and even an injunction, all give rise to a strong inference of willfulness.

## VI. Conclusion

For the foregoing reasons, the motion for summary judgment, dkt. 45, is granted. The court enters summary judgment on Counts One and Two, and enters a summary judgment as to willfulness.

Enter: 23 CV 4966
Date: August 19, 2025

_____
Lindsay C. Jenkins

8